IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Robin Willie Turner, | ) |
| | ) Case No. 10 CV 50326 |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Hirschbach Motor Lines, | ) |
| | ) Judge Philip G. Reinhard |
| Defendant. | ) |

**ORDER**

For the reasons stated below, plaintiff's motion for partial summary judgment [117] is denied and defendant's motion for summary judgment [114] is granted. The case is terminated.

**STATEMENT-OPINION**

This case arises out of plaintiff Robin Willie Turner's six-count second amended complaint against defendant Hirschbach Motor Lines. *See* [102]. Count I alleges that defendant violated Title VII of the Civil Rights Act and 42 U.S.C. § 1981 for failing to hire him because of his race. Plaintiff alleged that while defendant's stated reason for failing to hire him was a positive drug urine test, defendant's agents were actually aware that his test was negative and they acted with discriminatory animus by switching his negative test with a positive one. Count II alleges that defendant cancelled his request for a split test of his urine sample without his consent. Count III alleges that agents of defendant demeaned him with insulting language. Count IV alleges that defendant retaliated against plaintiff by failing to hire him because he complained to his recruiter that defendant was requiring him to supply ten years worth of work references. Count V alleges that defendant illegally shared the results of his allegedly false positive urine test with other employers. Count VI alleges that defendant is liable for a civil conspiracy between an agent of defendant and the Medical Review Officer responsible for his urine testing to illegally cancel plaintiff's request for a split test.

On June 22, 2015, defendant filed a motion for summary judgment [114], as well as a memorandum in support [116], and Local Rule 56.1(a)(3) statement of facts [115]. Also on June 22, 2015, plaintiff filed his motion for partial summary judgment, memorandum, and statement of facts. *See* [117].

On July 13, 2015, plaintiff filed his response to defendant's motion, Rule 56.1(b)(3)(A)-(B) response to defendant's statement of facts, and Local Rule 56.1(b)(3)(C) statement of

1

additional facts. *See* [122]. Defendant also filed its response to plaintiff's motion [119], response to plaintiff's' statement of facts [121], and statement of additional facts [120].

On July 27, 2015, plaintiff filed his reply [126]. Defendant filed its reply [124], as well as its response to plaintiff's statement of additional facts [125]. Plaintiff did not respond to defendant's statement of additional facts. The parties' cross motions for summary judgment are now ripe for the court's review.

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. *Schepers v. Commissioner, Indiana Dept. of Corrections,* 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011). Instead, the court only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That said, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Prior to addressing the merits of the parties's motions, it is necessary to set forth the undisputed facts located in the parties' Local Rule 56.1 Statements of Material Fact with respect to each motion. In addition, the court is cognizant of its obligation to construe all disputed and undisputed facts in the light most favorable to each non-moving party with respect to the motion directed against it. *See Schepers*, 691 F.3d at 913.

## A. FACTUAL BACKGROUND.

1. Defendant's Motion for Summary Judgment.

As an initial matter, plaintiff responded to only two paragraphs, 16 and 19, of defendant's statements of undisputed facts. *See* [122-1]. Thus, all other facts are deemed admitted. *See* N.D. Ill. LR 56.1(b)(3) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.").

Plaintiff Robbie Willie Turner is a citizen of New Baltimore, Michigan. [115] at ¶ 1. Defendant Hirschbach Motor Lines is a carrier holding both common and contract carrier authority located in East Dubuque, Illinois. [115] at ¶ 2.

In April of 2010, plaintiff applied online for a position as a commercial truck driver for defendant. [115] at ¶ 6. He received a tentative offer of employment, which was contingent on becoming qualified as a commercial truck driver before he would be hired; such qualification required documentation of a commercial driver license, a save driving record, proper credentials, proper experience, a completed physical exam, and a negative result on a Department of

2

Transportation ("DOT") drug test. [115] at ¶¶ 7-8. As part of his application process, plaintiff was required to fill out a work history form, which was identical to those required of other candidates. [115] at ¶ 20. Defendant requires all driver candidates to provide ten years of work history. [115] at ¶ 21.

On April 19, 2010, plaintiff began his new driver orientation with defendant in a class of approximately ten other potential employees. [115] at ¶ 9. After filling out insurance forms, he was taken to a medical facility for his DOT physical and urine drug screen collection. *Id.* At 8:35 a.m., he submitted a urine specimen for a DOT pre-employment drug test. [115] at ¶ 10. He signed a required Donor Copy of the required Federal Chain of Custody Form, certifying that his urine sample was properly collected and that the chain of custody documentation had been properly completed. [115] at ¶ 11. His form was pre-printed with specimen ID number Y21079702 and his social security number was written in the space provided. *Id.* The form and donor copy included the name and address for MedTox Laboratories, Inc. ("MedTox"), an independent entity which would be testing his sample, as well as the name and phone number of defendant's designated Medical Review Officer, Dr. Richard Thompson, who was a physician working for St. Luke's Hospital in Sioux City and who was responsible for overseeing the drug testing of the potential employees and operating as the go-between for MedTox and defendant. [115] at ¶¶ 11-13. Defendant had contracted with St. Lukes Hospital in 2006 for an MRO-services agreement negotiated in an "arms length" transaction. [115] at ¶¶ 24-25. After the forms were complete, plaintiff's urine specimen was sent to MedTox for testing in accordance with federal requirements. [115] at ¶ 12.

On April 22, 2010, MedTox reported to Dr. Thompson that plaintiff's urine specimen tested positive for marijuana. [115] at ¶ 13. April 22nd was also the orientation graduation date for plaintiff's class of applicant drivers. [115] at ¶ 14. Lester Winegarden, defendant's Designated Employer Representative, called plaintiff into an office so that he could speak to Dr. Thompson by phone. *Id.* Winegarden then left the plaintiff alone in the room to speak to Dr. Thompson for a confidential donor interview, which is required by DOT regulations. *Id.*

During the phone call, plaintiff and Dr. Thompson discussed the marijuana-positive test result. [115] at ¶ 15. It is undisputed that plaintiff did not mention that he had ever seen a negative drug test report. *Id.* According to Dr. Thompson's records, plaintiff requested a split test at the time of the meeting; on the other hand, plaintiff did not testify whether he mentioned a split test request to Dr. Thompson, and in fact his testimony suggests that he first requested a split test later in a discussion with Winegarden. *See* [117-1] at 10; [116-2] at 22-25. At some point in the conversation, plaintiff hung up on Dr. Thompson and collected his things, intending to leave the training center without speaking to anyone. [115] at ¶ 15. After the interview, Dr. Thompson "verified" the positive laboratory test result within the meaning of the DOT drug testing regulations, indicating that a verified laboratory test result is one received "from an HHS-certified laboratory that has undergone review and final determination by the MRO." [115] at ¶ 15; [125] at ¶ 11; *see also* 49 C.F.R. §§ 40.3, 40.137(a) ("As the MRO, you must verify a

3

confirmed positive test result for marijuana . . . unless the employee presents a legitimate medical explanation for the presence of the drug(s)/metabolite(s) in his or her system.").

While waiting for transportation, plaintiff was informed that Winegarden needed to speak to him before he left. [115] at ¶ 17. It is undisputed that Winegarden began the conversation by indicating to plaintiff that he had a right to request a split test. [125] at ¶ 13. Plaintiff testified that he requested a split specimen be performed and sent to a facility where Winegarden did not know the MRO. [122-1] at ¶ 4; [125] at ¶ 4.[1] It is undisputed that during their conversation, plaintiff did not mention any negative pre-employment test results. *Id.* The remainder of the conversation is disputed. According to plaintiff, Winegarden made remarks that indicated that plaintiff did not "understand where you are," that he would never pass the urine test, and when plaintiff asked "[a]re you tell[ing] me there's some racial bullshit you're pulling me into?," Winegarden replied "Yea, you got it. You got it now. You understand." [125] at ¶ 13. Following the meeting with Winegarden, plaintiff returned home. [115] at ¶ 18.

Following his conversation with plaintiff, Winegarden spoke to Dr. Thompson. [122-1] at ¶ 5; [125] at ¶ 5. It is undisputed that Winegarden did not know Dr. Thompson socially and had met him only once before, when defendant and St. Luke's Hospital executed their MRO-services contract. [115] at ¶ 25. It is undisputed that Winegarden informed Dr. Thompson that plaintiff no longer wanted to have a split test performed. [122-1] at ¶ 5; [125] at ¶ 5. It is undisputed that a split test was never performed. [122-1] at ¶¶ 6-7; [125] at ¶¶ 6-7.

At all relevant times, defendant was a member of an industry consortium that administered defendant's drug testing maintenance and reporting obligations under DOT regulations. [115] at ¶ 23. Defendant transmits all of its DOT drug testing results to its industry consortium in furtherance of its obligations under FMCSA and DOT regulations. *Id.* Following the events above, defendant reported plaintiff's positive laboratory test result to the consortium. [115] at ¶ 22.

2. Plaintiff's Motion for Summary Judgment.

The disputed and undisputed facts set forth with regard to plaintiff's partial motion for summary judgment are substantially similar to those set forth in defendant's motion. Notably, plaintiff failed to reply to defendant's statement of additional undisputed facts, and thus for the purposes of plaintiff's motion those facts are undisputed. Paragraph 13 of defendant's statement of additional undisputed facts provides that "Winegarden would not have informed the [Medical

---

[1]Defendant appears to have misnumbered its reply to plaintiff's statement of additional facts. *See* [125]. Defendant correctly numbers its reply up to paragraph 3, but then in replying to plaintiff's paragraph 4, defendant refers to it as paragraph 3. Defendant's reply to plaintiff's paragraph 5 is paragraph 4, and so on. Thus, the court has corrected all of defendant's paragraphs beginning with paragraph 4 to reflect their true order.

Review Officer] that a donor no longer wanted a re-test unless the donor specifically informed Winegarden of that fact." [120] at ¶ 13.

**B. ANALYSIS**

Defendant argues that it is entitled to summary judgment on all counts. Plaintiff argues that he is entitled to summary judgment on Counts V and VI. The court will address each motion in turn.

1. Defendant's Motion for Summary Judgment.

A. Counts I, III, and V.

As a preliminary matter, plaintiff has made a number of concessions throughout the summary judgment proceedings that narrows the scope of this court's analysis. In its motion for summary judgment, defendant argued that plaintiff could not possibly have seen a negative test result before speaking to Dr. Thompson, because the results had not been prepared for the employees, and thus his allegations regarding Count I were false. Plaintiff did not respond to this argument in his response brief, abandoning that claim, and thus summary judgment in defendant's favor with regard to Count I must be granted.

Next, with regard to Count III, plaintiff concedes in his briefing that "Nancy Thomas's acts and gestures in the instant case might not have been themselves by themselves actionable." [122] at 3. The court agrees, and notes that plaintiff did not even address Ms. Thomas's "acts and gestures" in his statement of additional undisputed facts. Thus, summary judgment in defendant's favor must also be granted with respect to Count III, which is based solely upon Ms. Thomas's alleged insulting language and plaintiff's resulting embarrassment.

With regard to Count V, alleging that defendant improperly forwarded plaintiff's positive drug test, plaintiff admitted paragraph 13 of defendant's statement of undisputed facts, which provided that MedTox, an independent testing facility, reported plaintiff's positive urine test to defendant. Plaintiff also admitted paragraphs 22 through 24, explaining that defendant was a member of an industry consortium that administered defendant's drug testing maintenance and reporting obligations under DOT regulations, and that defendant transmits all of its DOT drug testing results to its industry consortium in furtherance of its obligations under FMCSA and DOT regulations. Thus, according to the undisputed facts, defendant was not only permitted, but required to submit plaintiff's positive result to its industry consortium; as such, summary judgment with regard to Count V must be granted.[2]

---

[2]Plaintiff also argues that the results should not have been disclosed because they were not "verified" and because he did not sign a "HireRight" release form. First, as noted above, defendant has shown that plaintiff's results were "verified" within the meaning of the regulations. *See* [115] at ¶ 15; [125] at ¶ 11; *see also* 49 C.F.R. §§ 40.3, 40.137(a) ("As the

5

For the foregoing reasons, summary judgment in favor of defendant is granted with regard to Counts I, III, and V.

B. Counts II and IV.

The parties' arguments are largely restricted to the remaining counts. In Count II, plaintiff alleges that defendant, through its agent Winegarden, racially discriminated against him by cancelling his request for a split test without his consent. In Count IV, plaintiff alleges that after he complained about the requirement that he give ten years of work history references, Thomas and Winegarden retaliated against him by conspiring to prevent him from being hired, which they accomplished after he failed his urine test.

"An employer who discriminates against an employee because of his race . . . violates [both Title VII] and 42 U.S.C. § 1981. We apply the same standards to Title VII and § 1981 discrimination and retaliation claims." *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015). "Section 1981 prohibits, among other things, an employer from discriminating against a job applicant on the basis of the applicant's race. As with other discrimination claims, a plaintiff can proceed by introducing direct or circumstantial evidence of discrimination, the so-called 'direct method' of proving discrimination." *Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005). "Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus. A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir.2004) (internal citations and quotation marks omitted).

Here, plaintiff testified that defendant, through Winegarden, admitted that plaintiff would never pass the drug test due to his race. Plaintiff also testified that he never withdrew his request for a split sample. Finally, defendant admits that Winegarden informed Dr. Thompson that plaintiff wished to cancel the split test. As such, plaintiff has presented sufficient evidence under the direct method and the court is required to assume at this stage a discriminatory purpose behind the cancellation of his split test.

That does not end the analysis, however. Defendant does not focus on the discrimination or retaliation allegations, but rather argues that it is entitled to summary judgment on Counts II and IV on causation grounds. Both counts rely on the allegation that defendant cancelled

---

MRO, you must verify a confirmed positive test result for marijuana . . . unless the employee presents a legitimate medical explanation for the presence of the drug(s)/metabolite(s) in his or her system."). Second, plaintiff's only support for his claim that he did not sign a required release is a blank HireRight form that is inapplicable to his situation. *See* [122-1] at ¶¶ 8-9. As such, these arguments do not change the analysis.

6

plaintiff's request for a split test, which defendant argues is insufficient to establish causation because plaintiff has not raised a genuine issue of fact as to whether his first result was a false positive and that a split test would have led to a negative result. This presents a difficult issue. On the one hand, defendant's failure to perform the split test deprived plaintiff of the opportunity to determine whether his positive result was a false positive. On the other hand, plaintiff presents no evidence that defendant's alleged discriminatory animus had any effect on his drug test itself or that MedTox's testing was improperly performed or otherwise unreliable.

The latter point cannot be emphasized enough. While in many cases causation issues are properly within the domain of the finder of fact, as defendant points out, to survive summary judgment plaintiff must proffer *some* evidence that the allegedly improper cancellation of his split test caused him not to be hired. *See Mintz*, 788 F.3d at 681 ("Without corroborating evidence that supports an inference of causation, [plaintiff] cannot survive summary judgment using the direct method.") (internal quotations and citations omitted). Unfortunately for plaintiff, there is no evidence on this record which would support an inference of causation. Plaintiff's testimony regarding defendant's alleged racial animus provides no support because, first, it is undisputed that if his positive urine test was accurate defendant could not have hired him even if it wanted to, [115] at ¶¶ 7-8, and second, defendant's alleged racial animus could not have impacted the accuracy of plaintiff's test because defendant was not significantly involved in the test. Instead, the undisputed facts show that the test was performed properly and in conformance with required protocols by independent professionals, none of whom are alleged to have harbored racial animus. *See* [115] at ¶¶ 9-13, 24-25. Plaintiff proffers no evidence to cast doubt on the reliability of this particular test, such as by showing that proper procedures were not followed. He proffers no evidence to cast doubt on the reliability of urine tests generally, such as by supplying statistical data regarding the existence and degree of an error rate when proper procedures are followed. And he proffers no evidence to cast doubt on the positive drug result as applied to him, such as with evidence of negative drug results in close proximity or over a long period of time. Thus, there would be no basis for a jury to find that plaintiff's original result was incorrect other than to speculate that it is possible that false positives can arise even when urine drug testing is properly performed.

Other courts have found no causation in other legal contexts where plaintiffs alleged that they were wrongfully prevented from obtaining split sample or repeat drug tests. *See, e.g. Phillips v. Quality Terminal Services*, LLC, 855 F. Supp. 2d 764, 786-88 (N.D. Ill. 2012) (summary judgment granted for defendants in defamation case where plaintiff presented no evidence that original hair sample drug test was erroneously performed and that a subsequent test would have shown a different result); *Smeltzer v. Medtox Laboratories*, 2006 WL 2095468, at **4-6 (D. Minn. July 27, 2006) (summary judgment granted for defendants in negligence case against MedTox because plaintiff failed to present evidence to suggest that original drug test was incorrect); *Wrobleski v. Meyer*, 362 Wis.2d 539 (Table), 2015 WL 1894025, at **3-8 (Wis. Ct. App. 2015) (summary judgment granted for defendants in negligence case despite failure to perform a split sample test because absent any evidence of negligence in the original test the possibility that a split test would be negative "is entirely speculative"). In contrast, courts which

7

have found causation for failure to perform a split test have done so where there was evidence to suggest that the original test was unreliable. *See Wigginton v. White*, 364 Ill. App. 3d 900, 904-911 (1st Dist. 2006) (court reversed administrative suspension of school bus driver's permit due to a positive urine drug test where it found that there was evidence that a split specimen was not created during the original test despite it being required, plaintiff was not notified of her right to a split specimen test despite requirements that she be so notified, and plaintiff supplied numerous other negative tests prior to the positive test and a negative result taken immediately after the positive result).

The court agrees with defendant that plaintiff's claims must fail on causation grounds. Even assuming that defendant's agents acted with discriminatory and/or retaliatory animus in cancelling his split test, plaintiff does not raise a genuine dispute that their animus had any effect on his initial, independent, validated, and essentially unchallenged positive test. He presents no evidence to suggest that the initial test was in any way unreliable, such that it would lead to a false positive. His suggestion that a split test may have lead to a negative result is thus entirely speculative. *See Swetlik v. Crawford*, 738 F.3d 818, 828 (7th Cir. 2013) ("We must assume the truth of the non-moving party's evidence on summary judgment, but that duty does not extend to drawing inferences that are supported by only speculation or conjecture.") (internal quotations omitted). Because plaintiff cannot establish causation, Counts II and IV must fail.[3]

For the foregoing reasons, summary judgment in favor of defendant is granted with regard to Counts II and IV.

---

[3]The court notes that plaintiff requests that his claim go to a jury with a "loss of chance" instruction because he argues that defendant's actions in cancelling the split test denied him the opportunity to compete on an equal footing. [122] at 5-6. Loss of chance is an instruction which has been applied to failure-to-promote discrimination cases where a plaintiff was not hired at least in part because of discrimination but may not have been hired even if no discrimination occurred. *See Alexander v. City of Milwaukee*, 474 F.3d 437, 449 (7th Cir. 2007); *Doll v. Brown*, 75 F.3d 1200, 1206-07 (7th Cir. 1996). In these cases, the court found that there was evidence that discrimination played an active causal role in the adverse action and the question was whether the adverse action would have occurred if the stain of discriminatory animus had been removed. In the instant case, there is no evidence that discriminatory animus had any effect on whether plaintiff's positive result was a false positive or not, making those cases inapplicable here. His initial test either was a false positive or it was not, a question entirely removed from the issue of discrimination. Moreover, as noted above, the lack of any evidence proffered as to the degree, or even the existence, of an error rate in urine tests when all procedures are followed, as is undisputed here, would make it impossible to determine the likelihood or even the possibility that the original test was a false positive. For these reasons, the court declines to adopt the plaintiff's novel approach.

C. Count VI.

Defendant finally argues that summary judgment should be granted with respect to Count VI, alleging a civil conspiracy between Dr. Thompson and defendant's agent Winegarden. "The elements of a civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill.2d 302, 317 (Ill. 2004). "The agreement is a necessary and important element of this cause of action." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133 (Ill. 1999) (internal quotations omitted). "[A] defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *Id.* at 134 (internal quotations and alterations omitted). Moreover, "[i]f a civil conspiracy is shown by circumstantial evidence . . . that evidence must be clear and convincing." *Id.* "The mere characterization of a combination of acts as a conspiracy is insufficient" to establish a conspiracy. *See Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill.2d 12, 23 (Ill. 1998).

Count VI alleges a conspiracy between two persons, Dr. Thompson and defendant's agent Winegarden. Even construing all facts in favor of plaintiff, he has set forth no evidence from which the court can infer that Dr. Thompson was aware that Winegarden's statement that plaintiff wanted to cancel the split test was false. Thus, plaintiff's civil conspiracy claim must fail unless he is correct that cancelling a candidates's requested split test constitutes an "unlawful purpose" even if there was every reason for the MRO to believe that the candidate changed his mind and represented that he no longer wanted the split test performed. Plaintiff's support for this proposition is the fact that the relevant DOT regulations do not explicitly refer to whether an employee can revoke a request for a split sample.

The relevant DOT regulations provide as follows:

> As an employee, when the MRO has notified you that you have a verified positive drug test and/or refusal to test because of adulteration or substitution, you have 72 hours from the time of notification to request a test of the split specimen. The request may be verbal or in writing. If you make this request to the MRO within 72 hours, you trigger the requirements of this section for a test of the split specimen. . . .
>
> . . . .
>
> When the employee makes a timely request for a test of the split specimen under paragraphs (a) and (b) of this section, you must, as the MRO, immediately provide written notice to the laboratory that tested the primary specimen, directing the laboratory to forward the split specimen to a second HHS-certified laboratory. You must also document the date and time of the employee's request.

49 C.F.R. § 40.171(a), (c).

The regulations do not state whether the Medical Review Officer is still required to secure a split test if an employee who requests a split sample immediately changes his mind and revokes the request. Thus, the regulations are arguably ambiguous. But plaintiff's preferred interpretation does not comport with any common-sense reading. There is no reason to believe that an employee's request somehow prevents him from changing his mind, particularly in the event that he initially requests a split test before being reminded that he would ultimately be responsible for the cost. The regulations provide that an employer "may seek payment or reimbursement of all or part of the cost of the split specimen from the employee," 49 C.F.R. § 40.173(c), and plaintiff's proffered evidence suggests that defendant ultimately requires reimbursement for split tests from employees. [117] at 14. Because there is no evidence that Dr. Thompson was aware that plaintiff had not actually requested cancellation, and cancelling a split test is not automatically an "unlawful purpose" even if the plaintiff requests cancellation, the court declines to find that Dr. Thompson formed an agreement "for the purpose of accomplishing by some concerted action . . . an unlawful purpose[.]" *See Fritz*, 209 Ill.2d at 317. As such, summary judgment must be granted with respect to Count VI.

For the foregoing reasons, summary judgment in favor of defendant is granted with regard to all Counts, I through VI.

2. Plaintiff's Motion for Partial Summary Judgment.

Plaintiff argues that he is entitled to summary judgment on Counts V and VI. The court has found that, even construing the facts and inferences in favor of plaintiff, summary judgment must be granted in favor of defendant on those counts. For the reasons articulated above, plaintiff has failed to raise a genuine dispute of material fact on these counts, let alone show that he is entitled to summary judgment. As such, plaintiff's motion for partial summary judgment must fail.

For the reasons stated above, plaintiff's motion for partial summary judgment [117] is denied and defendant's motion for summary judgment [114] is granted. The case is terminated.

Date: 10/01/2015                    ENTER:

                                    _____
                                    United States District Court Judge

                                    Electronic Notices (LC)